UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:21-CR-00068-KAD |
| | ) | |
| v. | ) | |
| | ) | |
| Deandre GREENE | ) | MAY 11, 2022 |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF DECISION**
Re: MOTION TO SUPPRESS, ECF No. 25

Kari A. Dooley, United States District Judge:

Pending before the Court is Defendant Deandre Greene's motion to suppress evidence collected by members of the Waterbury Police Department during the early morning hours of January 31, 2021, following his arrest. The Defendant asserts that the evidence was obtained in violation of the Fourth Amendment and is therefore subject to the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643, 657 (1961). For the reasons that follow, the motion is GRANTED.

**Undisputed Facts[1]**

In the early morning hours of January 31, 2021, the Waterbury emergency dispatcher received a 911 call in which the caller reported that he and his friend were walking by the market or corner store on Oakville Avenue when his friend was shot at. (Gov.'s Ex. C.) The caller

---

[1] The Defendant initially sought an evidentiary hearing on his motion and submitted a declaration in which he avers to a series of events that were contradicted by police reports prepared by Officers Carpentieri and Porzio of the Waterbury Police Department. (He later supplemented this declaration in his reply brief.) However, it was subsequently learned that the events in question were captured by security cameras at the scene. Insofar as the video footage was in accord with the Defendant's declaration, and because it provided the Court with the information needed to decide the motion, both parties agreed that no evidentiary hearing was required. The Court received, as attached to the parties' briefs, the following exhibits: the audio recordings of the 911 calls (Gov.'s Exs. B, C, D, & E); the 911 Call Summary Report (Gov.'s Ex. A); the video surveillance footage of the encounter at issue (Gov.'s Ex. G); the Waterbury Police Department Case/Incident Report authored by Officer Carpentieri (the "Carpentieri Report"); the Waterbury Police Department Case/Incident Report authored by Officer Porzio (the "Porzio Report"); the Waterbury Police Department Case/Incident Report authored by Crime Scene Technician Tani (the "Tani Report"); a Report of Interview of Waterbury Police Officer Porzio (the "Porzio Interview"); and numerous photographs of the area generally as well as from the night of the Defendant's arrest (Def.'s Exs. 2, 7, & 8).

indicated that his friend ran into the woods because he was scared. (*Id.*) After the caller clarified that he was in the vicinity of Oakville Avenue and Angel Drive, the 911 operator instructed the caller to contact his friend and have his friend call 911 directly. (*Id.*)

At 4:05 a.m., the 911 operator received a second call from an individual who initially reported that he was at 76B Angel Drive. (Gov.'s Ex. B.) This caller, also referred to as the "Complainant," initially reported that he had heard gunshots at the corner store. (*Id.*) He stated that he was walking down the street to his friend's house, and a bullet went "right past" him. (*Id.*) When asked about how many shots he heard, he responded by stating that he heard one shot and that he saw the people too, though he did not know their faces. (*Id.*) The caller further stated that the shooter was in a silver car and that the incident happened "like ten minutes ago." (*Id.*) He was later asked in which direction the vehicle left, and he stated that the car took off down Oakville Avenue. (*Id.*)

The caller was clearly agitated and fearful throughout the call. When initially asked for his phone number, the caller asked the 911 operator to hold on before commenting that the situation was "crazy." (*Id.*) Later in the call, the caller indicated that he was hiding in the woods and that he was going back to the house. (*Id.*) He indicated that he was trying to escape. (*Id.*) The dispatcher stayed on the telephone with the caller until the police arrived on the scene.

At 4:07 a.m., the 911 operator dispatched Officers Matthew Carpentieri and Anthony Porzio to the scene of the shots fired incident, reported as the area of Angel Drive and Whitewood Road. (Gov.'s Ex. A, at 1.) Officer Carpentieri arrived on scene first, at 4:12 a.m. (*Id.*) Officer Porzio arrived one minute later. (*Id.*) Upon his arrival, Officer Carpentieri contacted the Complainant at 76 Angel Drive, Apartment B. (Carpentieri Report, at 2.) Officer Carpentieri indicates in his police report that the Complainant told him that he was walking on Oakville

2

Avenue with his friend when he heard a single gunshot; that the Complainant believed that he heard the bullet pass by him; that the Complainant observed a couple of people standing outside of their cars in front of 227 Whitewood Road, to the left of the building; that he did not see who fired the gun because he was 250 to 300 meters away; and that once the gun was fired, a silver or light colored car left the scene in an unknown direction.[2] (*Id.*)

227 Whitewood Road is a strip-mall type commercial building. At one end of the building is a convenience store. On the other end of the building is the Bada Bingz Café, an afterhours night club.[3] There are other businesses in between the Café and the store. There is a parking lot behind the building that runs from the corner convenience store to the Bada Bingz Café. The building sits at the corner of Whitewood Road and Angel Drive with the parking lot being accessible from Angel Drive. Immediately beyond the intersection of Angel Drive and Whitewood Road is the intersection with Oakville Avenue.

Officer Porzio's police report indicates that he was dispatched to the scene as backup for Officer Carpentieri. (Porzio Report, at 1.) Officer Porzio's report confirms that Officer Carpentieri spoke with the Complainant, who stated that the shooting occurred down the street near 227 Whitewood Road. (*Id.*) In a February 2022 interview with AUSA Natasha Freismuth and ATF Hartford Special Agent Eric Ladyga, Officer Porizo recalled that the Complainant reported feeling a bullet brush by his head. (Porzio Interview, at 1.) Officer Porzio reported that he left Officer Carpentieri to collect more information from the Complainant and proceeded to the parking lot of

---

[2] There are factual differences between what the Complainant told the 911 dispatcher and what Officer Carpentieri reported that the Complainant reported to him. And the Government relies upon the Complainant's statements as contained in Officer Carpentieri's Report in its argument as to whether the stop was supported by reasonable suspicion. The Defendant renewed his request for an evidentiary hearing at oral argument if the Court was inclined to credit Officer Carpentieri's Report in rendering a decision on the instant motion.

[3] Angel Drive faces the back side of 227 Whitewood Road, so facing the strip mall from behind places the corner market on the left and the Bada Bingz Café on the right. The Complainant's statement that the people and the shooter were to the left of the building, consistent with the 911 call, would place the shooter by the corner market.

3

the Bada Bingz Café in order to make contact with some vehicles he had observed near the back of the establishment while speaking with the Complainant. (*Id.*)

A security camera captured the events in the parking lot behind the Bada Bingz Café. (Gov.'s Ex. G.) At 4:18:00 a.m., at least three vehicles were in the parking lot, near the end of the parking lot farthest from the corner store, and several people were out of their vehicles moving around. At 4:18:14, two vehicles, one white and one dark, drove toward the parking lot exit onto Angel Drive. Before either car reached the exit, Officer Porzio's police car entered the parking lot, and he activated his emergency lights. The white sedan, in which the Defendant was a rear seat passenger, slowed and came to a complete stop as Officer Porzio approached the vehicle on foot at approximately 4:18:33. The dark vehicle drove around Officer Porzio's vehicle and exited the parking lot. Officer Porzio's vehicle did not block either car's egress from the parking lot. Consistent with the video footage, the Defendant's declaration states that "a uniformed police officer on foot instructed the driver of the car to stop." (Def.'s Decl. ¶ 5.)

In the video, Officer Porzio can be seen conversing with the driver through the driver's side window for approximately twenty seconds after the sedan has come to a full stop.[4] Officer Porzio eventually asked the driver to exit the vehicle, and at approximately 4:18:54, both the driver's door and the passenger-side rear door of the white sedan opened. The driver and the rear seat passenger—the Defendant—both exited the vehicle a few seconds later.[5] Officer Porzio did not ask the Defendant to exit the vehicle. (Porzio Interview, at 1–2.) Nevertheless, the Defendant can be seen clearly standing outside the vehicle at 4:19:00, and the Defendant asked Officer Porzio

---

[4] The Court did not receive evidence as to the nature or content of the conversation with the driver.
[5] During his February 2022 interview with AUSA Freismuth and Special Agent Ladyga, Officer Porzio remembered asking the driver to exit his car for safety concerns and to negate the risk that the driver would take off, but he did not initially remember that the driver actually exited the vehicle. After being shown the surveillance footage of the incident, Officer Porzio then remembered that the driver had in fact exited the vehicle. (Porzio Interview, at 1–2.)

4

either why he had been stopped or if Officer Porzio wanted the Defendant to get out of the car as well.[6] (Porzio Interview, at 1–2; Def.'s Decl. ¶ 11.) Officer Porzio indicated that, at this point, he believed that the Defendant was a flight risk because the Defendant appeared nervous and asked the same question repeatedly. (Porzio Interview, at 1–2.)

Seven seconds after exiting the white sedan—at 4:19:07—the Defendant stepped back from the vehicle, closed the door, and ran. Office Porzio gave chase.

The Defendant, with Officer Porzio in pursuit, ran toward Oakville Avenue. (Porzio Report, at 1.) Officer Porzio observed the Defendant throw off his jacket "next to the café" while the Defendant was running and then saw the Defendant, just before the Defendant reached Whitewood Avenue, run out of his shoes. (*Id.*) Officer Porzio ordered the Defendant to stop, but the Defendant kept running, eventually reaching the woods on the far side of Oakville Avenue. (*Id.*) The Defendant then fell in the snow, and Officer Porzio jumped on the Defendant, who then gave up and allowed Officer Porzio to place him in handcuffs. (*Id.*) After being escorted out of the woods and patted down, the Defendant stated that he ran because he believed that he had a warrant from Rhode Island. (Carpentieri Report, at 3.)

A crime scene technician arrived on scene at approximately 5:20 a.m. (Tani Report, at 1.) The technician recovered a Diamondback 9mm firearm from the pocket of a jacket found near the side of the building. (*Id.* at 1–2.) The pistol had a live round in the chamber and two live rounds in its magazine. (*Id.* at 1.) The technician also found what appeared to be a single G.F.L. 9mm Luger fired cartridge casing across the street from the jacket.[7] (*Id.* at 2.) A white lanyard with four

---

[6] Officer Porzio reports that the Defendant asked him more than once why he had stopped the vehicle. (Porzio Interview, at 1–2.) The Defendant's declaration submitted in reply to the Government's opposition avers that he asked Officer Porzio whether he wanted him to exit the vehicle as well. (Def.'s Decl. ¶ 11.)

[7] The Defendant observes that the shell casing, found on the street by the market, is consistent with the 911 caller's observation that the shot occurred by "the corner market."

individual keys and one key fob, a black fitted hat, and two black sneakers were also recovered from the scene. (*Id.* at 2.)

**Discussion**

The Defendant asserts that he was illegally seized when Officer Porzio stopped the vehicle in which he was a passenger and that all of the evidence gathered thereafter are fruits of this illegal seizure. The Government counters that the Defendant was not seized until he was apprehended in the woods and that the evidence was therefore abandoned by the Defendant prior to the seizure. Alternatively, the Government argues that if the Defendant was seized when Officer Porzio stopped the vehicle, the stop was supported by reasonable suspicion and therefore valid under the Fourth Amendment.

The Fourth Amendment of the U.S. Constitution protects the right of the people to be secure in their persons and against unreasonable searches and seizures. *See also United States v. Robertson*, 239 F. Supp. 3d 426, 441–42 (D. Conn. 2017) (discussing the analytical framework for a Fourth Amendment inquiry). A seizure of a person occurs, for purposes of the Fourth Amendment, "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), and either physical force has been employed to restrain the person or, absent such physical force, the individual has submitted to the assertion of law enforcement's authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Any tangible evidence discarded or abandoned prior to the point a seizure occurs cannot be the fruit of a poisonous tree. *See United States v. Swindle*, 407 F.3d 562, 572–73 (2d Cir. 2005) (citing *Taylor v. Alabama*, 457 U.S. 687 (1982); *Hodari D.*, 499 US. at 626).

As discussed above, the parties dispute the point in time at which Officer Porzio seized the Defendant. Citing to *Brendlin v. California*, the Defendant asserts that he was seized when Officer Porzio, through a show of authority, stopped the vehicle in which he was a passenger. *See* 551 U.S. 249 (2007). There is no dispute that the vehicle was stopped by Officer Porzio's show of authority. Nevertheless, the Government relies on a line of cases that derive from *Hodari D.* to argue that the Defendant's seizure only occurred in the woods when the Defendant was physically apprehended because the Defendant did not submit to Officer Porzio's show of authority when the car was stopped.

In *Hodari D.*, police officers saw four or five people near a red car, and when the police approached the group, they all ran. *Id.* at 622–23. The police gave chase, and during the ensuing chase, the petitioner tossed away a rock of crack cocaine before he was tackled to the ground and apprehended. *Id.* at 623. The Court held that because the suspect did not submit to the police officer's show of authority, no seizure had occurred until he was physically restrained, and the discarded crack rock was therefore not the product of an illegal seizure. *Id.* at 626. In so holding, the *Hodari D.* Court noted that meeting the *Mendenhall* reasonable person test was a necessary but not sufficient requirement for finding that seizure had occurred. *Id.* at 627–28 (citing *Mendenhall*, 446 U.S. at 573). The *Hodari D.* Court's analysis of *Mendenhall* established that the *Mendenhall* test reveals when a seizure by show of authority *might* occur, but for a seizure to *actually* occur, *Mendenhall*'s reasonable person must actually submit to that show of authority. *See id.* at 627–28. Anything less would be a failed attempt at a seizure, and as the Court would later say, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998).

7

A traffic stop—in which police make a show of authority, typically by using lights or sirens, and the driver of a moving vehicle subsequently pulls over—therefore falls squarely within the scope of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Brendlin*, 551 U.S. at 255 ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief.") (quotations omitted); *Whren v. United States*, 517 U.S. 806, 809–10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."). However, *Prouse* did not squarely answer the question of whether a traffic stop seizes not just the driver of a vehicle but also any passengers riding in the vehicle.

In *Brendlin,* the Supreme Court decided explicitly what it had long suggested in *dicta*: "[D]uring a traffic stop an officer seizes everyone in the vehicle, not just the driver." 551 U.S. at 255 (citing *Prouse*, 440 U.S. at 653; *Colorado v. Bannister*, 449 U.S. 1, 4 n.3 (1980) (*per curiam*); *Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984); *United States v. Hensley*, 469 U.S. 221, 226 (1985); *Whren*, 517 U.S. at 809–10*).* The defendant, Bruce Brendlin ("Brendlin"), was the front-seat passenger in a vehicle that was pulled over by police officers, concededly without probable cause or reasonable suspicion. *Id.* at 253 n.2. One officer recognized Brendlin to be someone who might be in parole violation status. *Id.* at 252. The officer returned to his vehicle and confirmed that Brendlin was a parole violator with an outstanding warrant for his arrest. *Id.* While the officer was in the patrol car, he saw Brendlin briefly open and then close the passenger door of the vehicle. *Id.* The officer then removed Brendlin from the car at gun point, arrested him and, during a search incident to the arrest, seized an orange syringe cap. *Id.* Subsequent searches of the driver and the vehicle revealed tubing, a scale, and other items used to produce methamphetamine. *Id.* Brendlin

was charged with possession and manufacture of methamphetamine and thereafter sought to suppress all evidence as the result of an unconstitutional seizure. *Id.* at 253. The Court reached its conclusion by asking whether "a reasonable person in [Defendant's] position when the car stopped would have believed himself free to 'terminate the encounter' between the police and himself." *Id*. at 256–57 (quoting *Florida v. Bostick,* 501 U.S. 429, 436 (1991)). The Court concluded that "in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." *Id.* at 257.

The Court's observations in reaching this conclusion are instructive. "A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road and the police activity that normally amounts to intrusion on 'privacy and personal security' does not normally (and did not here) distinguish between passenger and driver." *Id.* (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)). The Court continued:

> An officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing. . . . [And] even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place.

*Id.* The Court also observed that "[i]t is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety." *Id.* at 258. Indeed, "societal expectation of "'unquestioned [police] command'" is "at odds with any notion that a passenger would feel free to leave, or to terminate

the personal encounter any other way, without advance permission." *Id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). Accordingly, the Court held that Brendlin "was seized from the moment [the] car came to a halt on the side of the road." *Id.* at 263.

In so holding, the Court found that Brendlin had submitted to the officer's authority. *See id.* at 261–62. The Court reasoned that "what may amount to a submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 262. Thus while Brendlin could not signal his submission before the car came to a stop, once the vehicle stopped, Brendlin submitted "by staying inside." *Id.* Post-*Brendlin,* Courts have applied this reasoning and found that passengers have not been seized when they immediately exited the vehicle in which they were traveling. *See United States v. Jones*, 562 F.3d 768, 774–75 (6th Cir. 2009) (holding that, unlike the passenger in *Brendlin*, a passenger was not seized as part of traffic stop because he "did not submit by staying inside the [vehicle] after the officers arrived; he jumped out of the car and submitted only when [the officer] identified himself as a police officer and ordered him to stop"); *United States v. Chambers*, No. 20-CR-233 (VLB), 2022 WL 462149, at *3 (D. Conn. Feb. 15, 2022) (holding that where suspect passenger immediately exited vehicle upon the activation of the officer's emergency lights and dropped a bag behind the vehicle into the street, the bag was abandoned prior to his submission to and seizure by law enforcement).

Here lies the crux of the Defendant's motion. The Court must determine whether, like in *Brendlin*, the Defendant submitted to Officer Porzio's show of authority and was therefore seized for purposes of the Fourth Amendment, or whether he did not submit to Officer Porzio's show of authority and was therefore not seized until he was physically apprehended by Officer Porzio, like the youth in *Hodari D.*

"Whether conduct constitutes submission to police authority will depend . . . on the totality of the circumstances—the whole picture." *United States v. Huertas*, 864 F.3d 214, 216 (2d Cir. 2017) (quoting *United States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007)) (further quotations omitted). "Conduct that amounts to evasion of police authority is not submission." *Id.* (quotations and alterations omitted). Evasion occurs when a suspect maximizes his chance of eluding police by appearing to comply with an order to stop before running as soon as the officer puts himself in a disadvantageous position. *See Baldwin*, 496 F.3d at 219 (holding that no seizure occurred at a traffic stop where a suspect evaded police by stopping, waiting for police to exit their cruiser and approach his vehicle on foot, and then driving off); *see also Swindle*, 407 F.3 at 572 (holding that no seizure occurred because the suspect fled after police activated their emergency lights even though the activation of the lights was without basis.). Evasive behavior—and a lack of submission—can also be found where "a suspect remains out of reach and takes flight when police move to lay hands on him." *See Huertas*, 864 F.3d at 218. Nevertheless, the focus of a court's inquiry is on "the nature of the interaction [with police], not its length." *See Baldwin*, 496 F.3d at 217.

In *Baldwin*, on which the Government principally relies, police responded to a report that individuals associated with a particular vehicle were carrying firearms. *Id.* at 216. Police initially did not see any suspects at the reported location, but as they continued driving, the officers saw a vehicle matching the description in the report. *Id.* The officers initiated a traffic stop, and the vehicle did indeed stop shortly thereafter. *Id.* at 217. But as the officers approached the vehicle on foot, the driver leaned out the window, watched the officers as they approached the vehicle, ignoring commands that he show his hands, and, when the officers were close, sped off. *Id.* A police pursuit ensued, with the police eventually apprehending the defendant after he crashed his

vehicle and led police on a subsequent foot chase. *Id.* Police searched both the defendant's person and his car after chase and found several guns and drug paraphernalia. *Id.* The defendant later filed a motion to suppress, seeking to exclude from trial the guns and drug paraphernalia on the grounds that he had been seized for Fourth Amendment purposes when the initial traffic stop occurred and that such stop was unreasonable, making the evidence recovered after his apprehension the fruit of an unreasonable seizure. *Id.* at 218.

The Second Circuit rejected this position and found that no seizure occurred when the defendant initially stopped his vehicle because the defendant had not actually submitted to the officer's show of authority. *See id.* Consequently, none of the physical evidence was the product of an unlawful seizure. *Id.* Looking at the totality of the circumstances, the Circuit reasoned that the defendant's behavior amounted to "evasion of police authority, not submission." *Id.* at 219. The Circuit emphasized that its ruling was not predicated on the brevity of the suspect's stop but on the fact that the stop itself did not constitute submission—"it is the nature of the interaction, not its length, that matters." *Id.*

Here, the Defendant was seized under *Brendlin* when the vehicle was stopped by Officer Porzio unless the Court concludes that he evinced a decision not to submit to Officer Porzio's show of authority.[8] *See Johnson*, 562 F.3d 768, 774–75; *Chambers*, 2022 WL 462149, at *3.

---

[8] In the Court's view, the Defendant's status as a passenger of a vehicle prevents either *Huertas* or *Baldwin* from dictating the outcome of this motion to suppress, and the Court views both cases as distinguishable in any event. In *Baldwin,* the Court specifically noted that the defendant-driver waited and watched the officers approaching his vehicle leaving the scene as soon as they were close to his vehicle and far away from their own. *Baldwin*, 496 F.3d at 217. Significantly, the driver was also **refusing to comply with the officers' commands to show his hands** as they approached the vehicle. *Id.* From this the court concluded that his conduct revealed an intention to evade, not submit to the officer's authority. *See id.* at 219. Here there is no evidence that the Defendant refused any command. Similarly, in *Huertas,* the police officer had illuminated the defendant standing on a sidewalk with his spotlight and had initiated the encounter by asking him some questions. *Huertas*, 864 F.3d at 215. When the officer began to exit his vehicle, the defendant ran. *Id.* Both the timing and nature of the interaction led the court to conclude that Huertas did not submit to authority but instead attempted to evade authority. *Id.* at 217. Notably, the *Huertas* Court did not reach the issue of whether the officer's conduct amounted to a show of authority in the first instance. *Id.* at 216. These facts are qualitatively different from the circumstances presented here.

Submission may be inferred from a failure to get up and run or, for a passenger in a vehicle, by staying in the vehicle. *See Brendlin*, 551 U.S. at 562. *See also Arizona v. Johnson*, 555 U.S. 323, 327 (2009) ("For the duration of a traffic stop . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.") (quotations omitted). Further, the Supreme Court has made clear that even a brief detention during a motor vehicle stop is a seizure under the Fourth Amendment. *Whren*, 517 U.S. at 809; *see also United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (describing a seizure under the Fourth Amendment as a "meaningful interference, however brief, with an individual's freedom of movement").

Under the totality of the circumstances, the Court concludes that the Defendant was seized for purposes of the Fourth Amendment when Officer Porzio, by show of authority, stopped the vehicle. Following this stop, the Defendant remained in the vehicle for approximately 20 seconds, and, thereafter, got out of the vehicle and engaged with Officer Porzio. Whether, as the Defendant asserts, he asked whether he too should get out of the vehicle or whether he asked Officer Porzio (repeatedly) why he stopped the car, either question is itself an acknowledgement of Officer Porzio's exercise of authority and the Defendant's prior submission thereto. The brevity of the Defendant's submission does not undermine this conclusion. *See Whren*, 517 U.S. at 809–10; *see also United States v. Wallace*, 937 F.3d 130, 137–38 (2d Cir. 2019) (discussing the permissible duration of a traffic stop).

Obviously, at some point, the Defendant decided to run away, and the Government would have the Court infer that such was his plan from the inception of the motor vehicle stop and that his initial acquiescence to Officer Porzio's authority was a ruse designed to conceal his plan and further his chances of escape—an effort to evade not submit to authority. But other than the fact of the Defendant's *eventual* flight, the Court has no factual basis upon which to infer that the

Defendant's apparent submission to authority was a ruse as was the case in *Baldwin*. The Government offers no evidence—from Officer Porzio or otherwise—showing that the Defendant's conduct while inside the vehicle evidenced any intention to flee.[9] Indeed, there is no evidence that the Defendant did anything other than just sit in the car for 20 seconds. What the *Brendlin* Court observed is equally true here: The Defendant "had no effective way to signal submission while the car was still moving . . . but once it came to a stop he could, and apparently did, submit by staying inside." *Brendlin*, 551 U.S. at 263. Accordingly, the Defendant was seized "from the moment [the] car came to a halt" in the Bada Bingz Café's parking lot. *Id.*

The Court further observes that the Defendant did not try to leave the scene until after Officer Porzio asked *the driver* to exit the vehicle. At that point, it is reasonable to infer that both the driver and the passengers, to include the Defendant, understood that the stop was not going to conclude in short order. But there is no evidence that Officer Porzio thereafter approached *the Defendant* or gave any indication he was about to put his hands on *the Defendant*. *See Huertas*, 864 F.3d at 218 (holding that no seizure occurred where, although the suspect initially answered an officer's questions, the suspect ran as soon as the officer began to approach the suspect). Nor is there anything in the record indicating that Officer Porzio instructed the Defendant to get back in the vehicle—or to do anything, for that matter—prior to his flight.[10] *See Baldwin,* 496 F. 3d at 218 (holding that no seizure occurred where although driver pulled over, he refused to comply with an order to show his hands and then quickly drove away). Such an exchange might support the inference that the Defendant intended to evade Officer Porzio's authority. Instead, the totality of

---

[9] To the contrary, the Defendant observes that had he had such an intention, he probably would have taken the 20 seconds to at least tie his shoes.

[10] In fact, the Court has no information at all about what Officer Porzio might have said to the Defendant in response to the Defendant's questions, whatever those questions might have been.

14

the circumstances support the inference that the Defendant submitted to that authority but then had a change of heart, not that he intended to evade authority from the inception of the stop.

In sum, the Defendant was seized when Officer Porzio stopped the vehicle and the Defendant submitted to that authority by remaining in the vehicle. That he subsequently changed his mind does not alter the nature of the interaction in the first instance. The Court must next determine whether this *Terry* stop was supported by reasonable suspicion.

"The Fourth Amendment to the United States Constitution protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against **unreasonable** searches and seizures.'" *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quoting U.S. Const. amend. IV) (emphasis added). "As this language indicates, the ultimate measure of the constitutionality of a government search or seizure is reasonableness." *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir.2014) (internal quotation marks omitted). Generally, reasonableness requires that law enforcement procure a warrant supported by probable cause before seizing a person, but "neither a warrant nor probable cause is 'indispensable' to reasonableness for every seizure." *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (citing *National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989)).

As relevant here,[11] "an officer may conduct a brief investigatory detention (commonly known as a "*Terry* stop") as long as the officer has reasonable suspicion 'that the person to be detained is committing or has committed a criminal offense.'" *Compton*, 830 F.3d at 61 (quoting

---

[11] Although Officer Porzio indicated in his interview that he was attempting to make contact with both of the vehicles in the parking lot, the Government ultimately did not advance any legal argument that Officer Porzio entered the parking lot or stopped the vehicle in search of potential witnesses pursuant to the special circumstances doctrine. *See Illinois v. Lidster*, 540 U.S. 419, 426–27 (2004) (holding that police checkpoints, which sought information about a recent hit-and-run accident from the public and lacked individualized suspicion, were reasonable under the Fourth Amendment); *see also Palacios v. Burge*, 589 F.3d 556, 562–63 (2d Cir. 2009) (holding that police reasonably detained club patrons without individualized suspicion under the special circumstances doctrine). The Court does not therefore address this issue.

*Bailey*, 743 F.3d at 332 and citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In *Terry*, "the Court reasoned that investigative stops serve an essential governmental interest by enabling beat officers to take 'swift action predicated upon . . . on-the-spot observations,' thereby furthering the efforts of police officers to effectively detect and prevent crime." *United States v. Arenas*, 37 F. Supp. 2d 322, 327 (S.D.N.Y. 1999) (quoting, *Terry*, 392 U.S. at 20.) "The circumstances necessary to justify a *Terry* stop are a reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" *Bailey*, 743 F.3d at 332 (quoting *Johnson*, 555 U.S. at 326). "A reasonable basis requires more than a 'hunch.'" *Id.* (citing *Terry v. Ohio*, 392 U.S. at 27). "Rather, it demands specific and articulable facts which, taken together with rational inferences from those facts, . . . provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *Id.* (citations and quotations omitted). "In assessing the reasonableness of an officer's suspicion, [the Court] must take into account 'the totality of the circumstances' and must 'evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *Compton*, 830 F.3d at 61 (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).[12]

The Government bears the burden of demonstrating the validity of the *Terry* stop. *See United States v. Antuna*, 186 F. Supp. 2d 138, 142 (D. Conn. 2002) (citing *United States v. Perea*, 986 F.2d 633, 644–45 (2d Cir. 1993)). The Government argues that the following facts combine

---

[12] The Fourth Amendment's reasonableness standard "governs not just the fact of the *Terry* stop but its scope." *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006). As with other aspects of a Fourth Amendment inquiry "[c]ourts assess 'reasonableness' in this context by 'balancing the particular need to search or seize against the privacy interests invaded by such action.'" *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (quoting *Bailey*, 743 F.3d at 331). "[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). But in judging an officer's attempt to protect the public, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Bailey*, 743 F.3d at 340 (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)). The Defendant does not advance any argument that the scope of the seizure was unreasonable, only that it was not supported by reasonable suspicion.

to form a reasonable suspicion to support the stop of the vehicle: the car fit the general description of the suspect vehicle (as purportedly told to Officer Carpentieri[13]); the responding officers were dealing with a "shots fired" call; less than 30 minutes had elapsed since the shot was fired; and there were historical problems at the Bada Bingz Café with respect to firearms and other issues.

The Defendant responds that the Complainant told the 911 operator **and** Officer Carpentieri upon his arrival that the shooter had fled the scene and therefore there was no reason whatsoever to stop the vehicle in which the Defendant was a passenger. He further observes that the Complainant stated that the shooter was by the corner store—which is the opposite end of the strip-mall which also houses the Bada Bingz Café. The Café, the Defendant notes, is an afterhours club, so the presence of cars and people in the parking lot was hardly remarkable or any cause for suspicion.

Under the totality of the circumstances, the Court agrees with the Defendant. *See*, *e.g.*, *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *United States v. Irizarry*, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007). There was no information linking the shooting to the Bada Bingz Café or its patrons. To the contrary, the shooter was identified (twice) as being at the opposite end of the strip mall by the corner store when the shot was fired. All indications were that the shooter had fled the scene 25 to 30 minutes prior to the motor vehicle stop. The Government's reliance on *United States v. Brown*, 334 F. 3d 1161 (D.C. Cir. 2003) is misplaced. There, although the Court held that the passage of 30 minutes did not eliminate all reason for suspicion at the scene of the crime, it did so because "it was certainly plausible that the person or persons who fired the gunshots might not

---

[13] Notably, determining whether a stop was supported by reasonable suspicion requires analyzing what the officer conducting the stop, as opposed to the responding force as a whole, knew at the time that the stop was conducted. *See United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (discussing the collective knowledge doctrine). Here, neither the government nor the Defendant puts any focus on what Officer Porzio himself knew. Rather the parties assume or perhaps agree that he was fully apprised of all available information at the time he made the stop.

17

have departed the area." *Id.* at 1166. Here, the Complainant made clear to both the 911 dispatcher and Officer Carpentieri that the shooter had fled the area in a vehicle. Further, there was nothing inherently suspicious about the presence of vehicles at that location in light of the afterhours club operating there, and the car stopped was not the only car in the area. *Compare United States v. Fisher*, 597 F. 3d 1156, 1159 (10th Cir. 2010) (finding that reasonable suspicion had been demonstrated where police responded to a 911 call within three minutes, in a high crime area, with every reason to suspect gunplay, and the only vehicle at the scene looked as if it was about to depart).

A "shots fired" call does allow for a more robust police response. *See, e.g.*, *United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (holding that a 911 call reporting an ongoing emergency is accorded a higher degree of reliability and requires a lesser showing of corroboration by police before initiating a *Terry* stop). But it does not extend to stopping a motor vehicle based upon the color of the vehicle alone, absent some other indicia of criminal conduct by the driver or the occupants, which is completely absent here. *See United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005) (holding that a *Terry* stop was not supported by reasonable suspicion where the officer "knew only that 'a red vehicle' had been involved in a reported [shots fired] incident approximately 15 minutes earlier, in the same general area where [the officer] first spotted the car"); *Arenas*, 37 F. Supp. 2d at 328 (holding that a *Terry* stop was not supported by reasonable suspicion where three men were "strolling down a New York City street on a busy weekday afternoon, pausing every now and then to window shop or enter a store, and eventually walk[ed] to the subway to go home"); *United States v. Bristol*, 819 F. Supp. 2d 135, 144 (E.D.N.Y. 2011) (holding that a *Terry* stop was not supported by reasonable suspicion where there was no direct evidence that the stopped vehicle had committed a traffic violation).

The Court concludes that the Government has failed to meet its burden of proving that Officer Porzio held a reasonable suspicion that the white sedan and its occupants were involved in the shots fired incident or were implicated in some other wrongdoing. *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981) ("Based upon that whole picture the detaining officers must have a particularized and objective basis *for suspecting the particular person stopped* of criminal activity.") (emphasis added).

**Conclusion**

For the forgoing reasons, the Defendant's Motion to Suppress is GRANTED. All evidence seized as a result of the unlawful seizure of the car in which the Defendant was riding, including the Diamondback 9mm handgun and ammunition therein, shall not be admissible at trial. *See Arenas*, 37 F. Supp. 2d at 330 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of May 2022.

                                             */s/ Kari A. Dooley*
                                             KARI A. DOOLEY
                                             UNITED STATES DISTRICT JUDGE